### THE RIDGEFIELD & NEW YORK RAILROAD COMPANY *vs.* JAMES H. BRUSH.

The charter of a railroad provided that the company might be organized and proceed to construct the road when $200,000 had been subscrib d, and that the corporators should open books for subscrip ions under such regulations as they might think proper. The corporators opened the books, with a form of subscription in which it was provided that not over two per cent. should be called in until the whole amount estimated to be necessary for the cons ruction of the road had been subscribed. The shares were fifty dollars each. The defendant subscribed for ten shares. The estimated expense of completing the road was $535,000 and less than $300,000 was subscribed. The company was organized and directors appointed. Some time after, *M & Co.* signed their names upon the book as subscribers for six thousand shares, making the subscription complete as to amount. Their subscription was in the same form with the others, but there was a private agreement with the directors that they should have the contract for building the road, and that they should pay for the stock half in cash and half in work and materials. After the subscription was made a contract was drawn, and signed by *M & Co.* and the directors, by which *M & Co.* were to construct the road according to the estimates and receive payment half in cash and half in stock. They were not at this time able to pay for the stock in cash, and this was known to the directors, but they were regarded as able to perform their contract for the construction of the road, and it was confidently expected by the directors that the subscription would be paid in full in cash and work in the proportion agreed. In fact however *M & Co.* were not able to perform their contract for building the road and performed but a small part of it. In a suit brought by the railroad company against the defendant to collect his subscription, in which the defence was that the whole sum required had not been legally subscribed, it was held that the subscription of *M & Co.*, as a contract binding upon them, could not be affected by the contemporaneous parol agreement as to the mode of paying for the stock, nor by the subsequent written contract for building the road, and was therefore a valid subscription, in the absence of actual fraud upon

Ridgefield & New York Railroad Company *v.* Brush.

the other stockholders, which was not found, and of legal fraud, an inference of which the facts would not warrant.   [Two Judges dissenting.]

It appeared that some time after the subscription of *M & Co.* was made, an installment of fifteen per cent. had been called in by the directors and had been paid by the defendant.   It however appeared that, although he had learned of the arrangement with *M & Co.*, he believed at the time, upon the representation of one of the directors, that they were able to pay for their stock and that the company had a guaranty for their doing so.   Held that the defendant was not to be regarded as having waived his right to object to the invalidity of their subscription, and that he was not estopped from denying his obligation to pay further installments upon his subscription by reason of the fact that other subscribers were led by his acts to pay their installments.

The charter authorized the company to organize and proceed to construct the road when $200,000 was subscribed.   The corporators made the subscriptions conditional upon the whole amount required for the completion of the road being subscribed.   Held that the condition was not inoperative as being repugnant to the provision of the charter.

And held that after the company was organized and the directors appointed all the subscriptions thereafter taken were to be regarded as received by the directors and not by the corporators, and that therefore any private agreement made with the directors was to be regarded as made with persons whose acts affected the corporation.

ASSUMPSIT, upon a subscription to the stock of the plaintiff corporation; brought to the Court of Common Pleas of Fairfield County and tried to the court, upon the general issue, before *De Forest, J.*   The court found the following facts:

The plaintiffs were incorporated as a railroad company at the May session of the General Assembly in the year 1867, with a capital of $450,000, to be increased at the pleasure of the corporation to $750,000, the same to be divided into shares of fifty dollars each.   The 3d section of the charter was as follows:

"The persons named in the first section hereof, or a majority of them, shall open books to receive subscriptions to the capital stock of said corporation at such a time or times and place or places as they or a majority of them may appoint, and shall give such notice of the times and places of opening said books as they shall deem reasonable, and shall receive said subscriptions under such regulations as they may adopt for such purpose."

The 4th section was as follows:

"The persons named in the first section hereof, or a major-

ity of them, are hereby authorized to call the first meeting of the stockholders of said corporation, in such way and at such time and place as they may appoint, whenever two hundred thousand dollars or more of the capital stock of said corporation shall have been subscribed for, to choose directors and perfect the organization of said corporation; and in all meetings of the stockholders of said corporation each share shall entitle the holder thereof to one vote, which vote may be given by said stockholder in person or by lawful proxy; and whenever said corporation shall have been so organized, it may proceed to commence the construction of the railroad hereinafter specified."

The corporators, under the authority of the 4th section of the charter, met on the 29th day of July, 1867, and adopted the following resolution with regard to the form and conditions of the subscriptions to be taken to the stock of the company, which resolution and form of subscription were entered in a book prepared and kept for such subscriptions, and all the subscriptions taken were made upon the same book and underneath the form so prepared.

"Resolution adopted by the board of corporators of The Ridgefield and New York Railroad Company, at a lawful meeting holden by them at Ridgefield, on the 29th day of July, 1867:

"*Resolved*, That no assessment shall be laid upon the stock subscribed of more than three per cent. until the whole amount of stock shall have been subscribed, estimated to be necessary for the completion of the road from Ridgefield to such point as shall be decided on by the company, and no assessment shall be made until $200,000 shall have been subscribed for the Stamford route, or $350,000 for the Greenwich route.

"The undersigned hereby agree to take the number of shares of the capital stock of The Ridgefield and New York Railroad Company, set to our respective names, subject however to, and payable on, the terms of the foregoing resolution, and only on condition that the southern point of said road shall terminate in the town of Greenwich or Port Chester. Dated Ridgefield, August 9th, 1867."

The defendant subscribed his name to this form of subscription, taking ten shares of the stock.

At the time the defendant subscribed less than $300,000 of the stock had been subscribed for, and the subscription remained for some time incomplete. The expense of the entire construction of the road, as estimated by the engineers of the company, was $534,973.

Soon after the corporators called the first meeting of the stockholders, at which the company was organized and elected a board of directors.

Afterwards, at a meeting of the directors, held on the 31st day of March, 1870, a firm by the name of Lawrence W. Myers & Co., consisting of L. W. Myers, A. D. Myers, and E. N. Myers, signed their names to the plaintiffs' subscription list for six thousand shares of stock, making the total amount of stock subscribed for enough to cover the estimated expense. Without the subscription of Myers & Co., a sufficient amount of stock to cover the estimated expense has never been subscribed for.

The subscription of Myers & Co., as it stood on the plaintiffs' subscription books, was apparently upon the same terms as the defendant's subscription, and there was nothing upon the subscription books to indicate that Myers & Co.'s stock so subscribed for by them was to be paid for in work or materials, or in any other way than in cash. By a private parol arrangement, however, between the directors of the railroad company and Myers & Co., it was agreed before the subscription was made that Myers & Co. should have the contract for constructing the road, and that only fifty per cent. of the stock so subscribed for was to be paid for in cash, and that the remainder of the price was to be paid in the work and labor and materials furnished by Myers & Co. in performing their contract and building the road; and their subscription was made pursuant to this understanding and agreement. It was well known to the directors at the time the subscription was made that Myers & Co. had not the pecuniary ability to pay for the stock in cash beyond the fifty per cent. thereof, and it was not by them expected that they would so pay for it, but

they did in good faith expect that the subscription would be fully paid in work and materials and in cash, in the proportion above mentioned.

On the 4th day of April, 1870, a written agreement was executed by Myers & Co. on the one part, and by the president and secretary of the railroad company on the other, under which Myers & Co. were to construct the road for the sum estimated as the cost of its construction, the part of which agreement important to the present case is as follows:

"Payments to be made as stated herein monthly, on the engineer's estimate, at the village of Portchester, New York. It is further mutually agreed, by and between the parties hereto, that said parties of the first part shall receive in payment for all work done under this contract, fifty per cent. in United States currency, and fifty per cent. in the capital stock of the said Ridgefield & New York Railroad Company at par, and no assessments shall be laid for cash on the six thousand shares to the capital stock subscribed for this day by the first party hereto. But said stock (or certificate therefor) shall be issued to said first party for payment of the work as hereinbefore described.'

The parol agreement between Myers & Co. and the directors, which existed at the time of Myers & Co.'s subscription, and the provisions of the contract afterwards executed pursuant to the agreement, were unauthorized by the other stockholders and unknown to them, and the defendant had no knowledge of them at the time the subscription of Myers & Co. was made and the contract for the construction of the road entered into.

The first assessment upon the defendant upon his subscription was paid May 27th, 1870, under the following circumstances:—The defendant was called upon by Henry Keeler, one of the directors, who was collecting assessments, being authorized by power of attorney from the treasurer so to do, and who had full knowledge of the circumstances under which the subscription of Myers & Co. was made, and of the provisions of the contract subsequently made by the directors with them, for fifteen per cent. of the stock subscribed for by him,

being the amount of the first assessment made upon the stock. The defendant, who had heard some rumors concerning the subscription of Myers & Co., but who had received and been able to obtain no definite information in relation to it, stated to Keeler that he had heard that one very large subscription, that of Myers & Co., was by an irresponsible party, and that it was not a subscription in accordance with the contract which he had made in his subscription; that he had no great objection to the directors stretching a link, provided it was their *bonâ fide* intention to build the road, but that he had heard that Myers & Co. could not respond if called upon to pay for their stock, and that it was rumored that a part of their subscription was payable in work and materials. Upon this Keeler stated to the defendant that it was true that a part of their subscription was payable in work and materials, but he further stated, and assured the defendant, that the matter was all right; that the directors had no intention of stretching their powers; that Myers & Co. could respond if called upon to pay for their stock; that L. W. Myers was worth a considerable amount, and that the railroad company had a guarantee that he would respond. The defendant thereupon said that, since he gave him such assurances, he would pay that assessment, but that if his representations turned out incorrect he should pay no further assessment. And the defendant then, and after the conversation above detailed, relying upon the assurances thus given him by Keeler, gave his check for the amount of said assessment of fifteen per cent., which check was paid upon presentation.

Myers & Co. were never in fact able to pay for their stock in cash, or to perform their contract for building the road, and they never have in any manner paid for the stock, and are insolvent and wholly unable to carry out their contract for building the road or in any other manner to pay for their stock, or any part thereof, except that they were able to, and did in fact, perform in part their contract by grading the road to a considerable extent, and paid by check the assessment upon their stock in part, but there was no evidence to show whether the check was paid or not. And the railroad

company had no guarantees that Myers & Co. could perform their contract or pay for their stock, except that they were recommended to the directors of the company by President Lyman of the Air Line Railroad, and by Peter C. Corning; and L. W. Myers himself, at the time he agreed to take the stock, assured the directors that he had $30,000 in cash and had friends to back him.

When the defendant was called upon by the collector for the second assessment he declined to pay the same, and ever since has uniformly refused payment of any further sum upon his subscription.

Upon the foregoing facts the plaintiffs claimed as matter of law:—

1. That the defendant's subscription must be regarded as unconditional, because the charter of the railroad company does not require that subscriptions for the stock of the company should be conditional, and therefore that the company and all the stockholders have a right to treat all subscriptions as though they were unconditional.

2. That if the defendant's subscription is to be regarded as upon condition that enough stock should be subscribed for to cover the estimated expense of the road before an assessment should be made, yet said conditions have been fulfilled, and the subscription of Myers & Co. was such a subscription as was contemplated in the condition.

3. That if the defendant's subscription was conditional, and the condition thereof has never been performed, yet the defendant has waived his right to refuse payment for his stock on the ground that the condition has not been performed, by paying the assessment of fifteen per cent., under the circumstances above detailed.

But the court ruled against these claims of the plaintiffs and decided that the defendant's subscription must be considered as conditional, and that the subscription of Myers & Co. was not such a subscription as was contemplated by the condition, and that there had been no waiver by the defendant.

The court having rendered judgment for the defendant, the plaintiffs moved for a new trial for error in the above rulings of the court.

Ridgefield & New York Railroad Company *v.* Brush.

*J. H. Olmstead,* in support of the motion.*

*C. G. Child,* contra.

CARPENTER, J.   The defendant subscribed for ten shares of the capital stock of the plaintiff corporation.   He paid an assessment thereon of fifteen per cent., and the balance having been regularly called for, he refused payment, and this action is brought for the recovery thereof.

The charter provides that certain corporators therein named shall open the subscription books under such regulations as they may deem proper, that the company may be organized whenever $200,000 of the stock shall have been subscribed for, and that the company may thereupon proceed to commence the construction of the railroad.

In July, 1867, the corporators met and opened the subscription books under the following regulations:

"*Resolved* that no assessment shall be laid upon the stock subscribed of more than two per cent. until the whole amount of stock shall have been subscribed, estimated to be necessary for the completion of the road from Ridgefield to such point as shall be decided upon by the company, and no assessment shall be made until $200,000 shall have been subscribed for the Stamford route, or $350,000 for the Greenwich route. We the undersigned hereby agree to take the number of shares of the capital stock of the Ridgefield & New York Railroad Company set to our respective names, subject however to, and payable only on, the terms of the foregoing resolution, and only on condition that the southern point of said road shall terminate in the town of Greenwich or Port Chester.   Dated at Ridgefield August 9th, 1867.   Shares fifty dollars each according to the charter."

The estimated expense for the completion of the road was

---

* The case was argued by the same counsel at the January Term, 1875, and by order of the court was re argued at the present term.   It was very ably and exhaustively argued on both sides, but as the questions involved in the case are so fully discussed in the prevailing and dissenting opinions of the court, the briefs of counsel are omitted.

$534,973. Subscriptions were obtained for an amount less than $300,000.

In April, 1870, L. Myers & Co. signed their names to the subscription list for six thousand shares of the stock, making the total amount subscribed enough to cover said estimated expense. Without their subscription it was insufficient for that purpose.

Myers & Co. subscribed apparently upon the same terms and conditions as the other stockholders, and all the subscriptions were payable in cash.

By a secret parol arrangement between Myers & Co. and the directors it was agreed, before Myers & Co. subscribed, that they were to have the contract for the construction of the road, and that only fifty per cent. of their stock was to be paid for in cash, and the remainder was to be paid for in labor and materials in building the road, and the subscription was made pursuant to this arrangement.

After the subscription was made a contract was made and executed between the company and Myers & Co., the material parts of which are as follows:—" Payments to be made as stated herein monthly, on the engineer's estimate, at the village of Port Chester, New York. It is further mutually agreed by and between the parties hereto, that said parties of the first part shall receive in payment for all work done under this contract fifty per cent in United States currency, and fifty per cent. in the capital stock of the said Ridgefield & New York Railroad Company at par, and no assessments shall be laid for cash on the six thousand shares to the capital stock subscribed for this day by the first party hereto. But said stock (or certificate therefor) shall be issued to said parties of the first part for payment of the work as hereinbefore described."

Before considering the main question in the case we will briefly notice some questions of minor importance.

1. The plaintiffs insist that the provision in the charter allowing the company to organize, &c., whenever $200,000 or more shall have been subscribed, is inconsistent with the regulation adopted by the corporators, and therefore that the subscriptions must be regarded as made under the charter, and

that the condition contained in the subscription is inoperative. If this be so, it follows that, inasmuch as more than $200,000 were subscribed without the subscription of Myers & Co., the subscription by the defendant is valid without reference to the disputed stock.　But we do not think that this is so.　The resolution adopted by the corporators, although it imposed a condition which is not in the charter, nevertheless is not repugnant to the charter, violates none of its provisions, and does not in any sense contravene any principle of law or of public policy.　It is simply a declaration in the contract, to which all the subscribers are parties, and therefore it amounts to an agreement that the corporation will not avail itself of the privilege of commencing the construction of the road until all the necessary funds to complete it are subscribed. Each subscriber agreed to contribute of his funds to the prosecution of this enterprise upon the conditions contained in the resolution and not otherwise.

The court correctly ruled that the contract was a conditional one.

2.　It is next objected that all the subscriptions, including that of Myers & Co., must be regarded as received by the persons named in the charter, and not by the directors, and therefore that the agreement with the directors could not affect the subscription.　The language of the charter is that the persons named may call the first meeting of the stockholders "whenever $200,000 or more of the capital stock of said corporation shall have been subscribed for, to choose directors and perfect the organization of the corporation."

After this was done we think all the affairs of the corporation, including that of receiving subscriptions to the capital stock, were subject to the control of the directors.

3.　The plaintiffs further claim that the defendant, by paying the first installment of his stock, waived any right he might otherwise have had to object to the validity of Myers & Co.'s subscription.

The defendant was informed that the subscription of Myers & Co. was payable in part in labor and materials, and had heard that they were irresponsible, but he was assured by

Keeler, who he had reason to suppose knew all the facts, that the matter was all right, that Myers & Co. could respond if called upon to pay for their stock, that Myers was worth a considerable amount, and that the railroad company had a guarantee that he would respond. Upon these assurances he paid the assessment. Under these circumstances we do not think there was any intentional relinquishment of a known right. He acted upon representations that were not strictly true. Had he known the facts he might have acted differently. For the same reasons there is no estoppel in the case. The defendant, instead of misleading others, was himself misled in respect to his rights as he viewed them.

We come now to the more important and vital question in the case. Did Myers & Co. subscribe for the stock within the meaning of the charter, and within the meaning of the resolution adopted by the corporators?

1. The contract which Myers & Co. signed was, on its face, precisely the same as that signed by the defendant. All the subscribers signed the same contract and assumed the same obligations. Each had reason to suppose that all the others stood in every respect upon the same footing with himself. In this respect the case differs from that of *New York, Housatonic & Northern Railroad Co.* v. *Hunt,* 39 Conn., 75. In that case the contractor did not subscribe for stock at all; he simply contracted to do the work and furnish materials and take stock in payment. He did not in any sense become a stockholder until he had earned the stock and received it in payment. We held that inasmuch as the stock was not subscribed for, and to be paid for in money, like the stock of the other subscribers, it was not a subscription within the meaning of the charter.

2. Myers & Co. attached to their signature no qualification or condition peculiar to their own subscription. It was not expressed to be payable partly in work and materials, and there was no reference in any part of the document to any other contract or writing, and no other contract was then in existence which by any rule of interpretation we can regard as a part of the subscription contract. In this respect the

case differs from some of the cases cited and relied on by the defendant's counsel.

In *Troy & Greenfield R. R. Co.* v. *Newton*, 8 Gray, 596, the contractors subscribed for stock, qualifying the subscription by the words " *being a portion of the twenty-five per cent. named in our contract for graduation.*" The contract provided that the stock was to be paid to him at par, or in case any stock was issued by the corporation below par then at the rate of the lowest issue. It was held not to be a subscription. The court say, " This subscription was, it is obvious, not a cash subscription, and not a promise to pay any cash assessment on the same." In the case before us there is a subscription carrying with it in contemplation of law an unqualified promise in writing to pay all assessments in cash.

In *Cabot & West Springfield Bridge* v. *Chapin*, 6 Cush., 50, two hundred shares were subscribed upon condition of paying for them by a transfer of a similar number of shares of the stock of the Connecticut River Railroad Company at their par value of $100 a share, the market price of the same being only $93 a share. It was held that that was not a legal subscription binding upon other shareholders who had not waived the objection. Whether the condition was by parol or in writing does not appear. From the statement of the case it may be inferred that it was by parol. But in the case last cited, the same judge gives the opinion of the court, and in referring to this case says:—" Two hundred shares were *by the terms of the subscription* to be paid for in the stock of the Connecticut River Railroad Company, share for share, &c." From this statement we may assume that the condition was expressed on the face of the subscription. If so the distinction between that case and the case before us is obvious. But there is a further distinction. In that case the stock was to be paid for at the rate of $93 for $100. In this case the stock is to be paid for in part by work and materials; but it does not appear that they are not equivalent to cash. If they are, the case is within the rule indicated by Judge Dewey in the case last cited, in which he says, " In our opinion the subscription for the four hundred shares was to be a subscription pay-

able in cash, *or its equivalent,* calculating the shares at the rate of $100 each."

3.    When Myers & Co. subscribed, the contract for building the road had not been executed.    The subscription therefore was not then affected by the written contract.    The parol agreement cannot upon any principle have the effect to vary or qualify the written contract of subscription.    It is familiar and elementary law that all negotiations between the parties relating to the subject matter are merged in the written contract.    Neither party will therefore be permitted to prove by parol a contract different from that expressed in the written instrument.    Is it so that a third party, for the purpose of relieving himself of an obligation, will be permitted to show by parol that this written contract is different from what it purports to be on its face?    We are not aware of any principle of law that will justify such a proceeding.

It is not a case of fraud, accident, or mistake.    No actual fraud is shown or claimed.    It is only claimed that the transaction, taken together, constitutes in law a fraud.    The subscription of Myers & Co. was not, in itself, a fraud upon the defendant.    It can only operate as such, *ab initio,* by giving effect to the parol agreement.    But the law will not give effect to the parol agreement.    Therefore the law will not pronounce the subscription fraudulent.

4.    The subscription being valid at its inception, did it become void by reason of anything which subsequently transpired?    It is claimed that the building contract made in pursuance of the previous parol agreement should have that effect.

It will be observed that this is not the ordinary case where two writings, designed to accomplish one object, are executed at the same time, by or between the same parties, and are to be construed together.    They were not executed at the same time, although probably upon the same day, for the court has found that the building contract was executed after the subscription.    Nor were they, strictly speaking, transactions between the same parties.    The contract was between Myers & Co. and the corporation, and could only be made after the organization of the company.    The stockholders as such could

have no voice in it.  The subscription was a transaction between the stockholders as individuals, and the contract thereby made could be, and usually is, made before the organization of the company.  The consideration for the contract of each stockholder proceeds, not from the corporation, for it is not yet in existence, but from the other stockholders.  The corporation, when organized, represents the stockholders, and may enforce the contract; the promise, in contemplation of law, being made to it.  The two contracts then may be, and in some respects should be, construed independently of each other, and with a view to carry out the object and purpose which each was designed to accomplish.  Viewed in this light it is obvious that Myers & Co. ought not to be permitted to gain an advantage over the other stockholders by means of any secret bargain or collusion with the directors.  So far as their contract with the directors operates as a fraud upon the stockholders, it should be declared void.  The fraudulent contract should fall and the contract made in good faith should remain in full force.  Courts will rarely enforce a fraudulent contract; much less will they do so when the effect will be to destroy an honest one.  If therefore this was an action against Myers & Co. on their subscription, it is very clear that a fraudulent arrangement with the directors to the prejudice of the stockholders would be no defense.  *Henry* v. *The Vermilion & Ashland R. R. Co.*, 17 Ohio, 187.  This point is virtually conceded.  But why recover upon it unless it is a valid subscription?  And if a valid subscription for one purpose, why not for all purposes?  It is no answer to say that Myers & Co., being parties to the fraud, may not take advantage of it, but that the defendant may, because other interests are now involved.  Each stockholder has a personal interest in the question.  Many of them probably have paid their subscriptions in full.  To allow others to withhold their subscriptions for this cause might be the means of defeating the whole enterprise; and that would practically perpetrate a fraud; if not the fraud contemplated, another one quite as objectionable.

It is also apparent that if Myers & Co. were solvent and able to pay for their stock this question would not have been

made; for in that case they must either perform their contract or pay in cash; either of which would have been satisfactory to the defendant; so that their failure to perform, and their inability to respond, come in as necessary elements in the consummation of the alleged fraud upon the defendant. The proposition then must be substantially this: a subscription originally valid becomes void by reason of the subsequent inability of the subscriber to pay for his stock; a proposition which the learned counsel for the defendant expressly disclaims.

We have thus far assumed that the contract was fraudulent, either in law or in fact, and have endeavored to show, notwithstanding the fraud, that the subscription is valid and binding, not only upon Myers & Co., but upon all concerned. We come now to inquire whether the contract can properly be regarded as fraudulent by the other stockholders.

It is not pretended that it was executed with a fraudulent design by either party. The finding is that "it was well known to the directors, at the time the subscription was made, that Myers & Co. had not the pecuniary ability to pay for said stock in cash beyond the fifty per cent. thereof, and it was not expected by the directors that they would so pay for the same, but they did in good faith expect that the subscription would be fully paid in work and materials, and in cash, in the proportions above mentioned." That effectually excludes the idea of actual fraud in the transaction. Was it legally fraudulent?

In answering this question we will consider the contract with reference to three possible contingencies. First; suppose the contract had been fully performed. It is not found, and we cannot presume, that Myers & Co. obtained any undue advantage. So far as we know, or can know, they gave to the company as favorable terms as any other contractors would have given. Presumptively therefore they were to give a fair equivalent for what they were to receive. If so, it is the same as if they had paid for their stock in the usual way, and received in return cash for their expenditures. That being so, their subscription was equivalent to a cash subscrip-

tion, and distinguishes this case from the case of *Cabot &*
*West Springfield Bridge* v. *Chapin.* That full performance
would have been satisfactory to the defendant is apparent, for
he was informed of the terms of the contract before he paid
the first installment, to which he did not object. His only
anxiety seemed to be that the contract would not be
performed.

In the second place, suppose Myers & Co. had broken their
contract, and were of pecuniary ability to pay for their stock
in cash. They then became not only nominally but really to
all intents and purposes cash subscribers, and must pay their
assessments like the other stockholders. In that event it will
not be pretended that the contract would operate to defraud
any one.

In the third place, suppose the breach of the contract to
have been occasioned by their pecuniary inability to perform
it. It must be remembered that the contract was made by
both parties in good faith, and was partially performed. Up
to the time of the breach therefore there was no taint of
actual fraud, and it is difficult to see how fraud can legally be
imputed. The failure of Myers & Co. was disastrous to the
interests of the corporation, and the stockholders thereby
suffered pecuniary loss. It was unfortunate, but misfortune
is not fraud. Myers & Co. may have failed by reason of dis-
honesty or mismanagement; but dishonesty and mismanage-
ment in the execution of a contract, do not make the contract
fraudulent *ab initio.* The directors in their anxiety for the
success of the enterprise may have made an improvident con-
tract; but improvidence is not fraud. For the same reason
they may have misjudged in respect to the ability of Myers
& Co. to fulfill their engagement; but a mistake in judgment
is not fraud. This contract was broken as many other con-
tracts are broken; but a breach of a contract is not necessa-
rily a fraud.

For these reasons a majority of the court are of the opinion
that the Court of Common Pleas misjudged as to the legal
effect of the subscription of Myers & Co. and of the building
contract, and therefore that there must be a new trial.

In this opinion FOSTER and PARDEE, Js., concurred.

PARK, C. J., (dissenting.)   The defendant subscribed for ten shares of the capital stock of the plaintiff corporation upon the express condition that the remaining stock sufficient for the construction of the plaintiffs' road, (amounting to more than five hundred thousand dollars,) should likewise be subscribed by other parties.   This appears by the charter of the company and by the resolution adopted by the corporators pursuant to authority vested in them by the charter, and by the estimated expense of constructing the road referred to in the resolution.

Now, the case finds that the condition annexed to the defendant's subscription was never fulfilled, unless the subscription of Myers & Co. for six thousand shares of stock was a proper subscription.   It follows, therefore, that the question whether or not the defendant is liable to further assessment, depends upon the question whether the subscription of Myers & Co. was in accordance with the resolution of the corporators.   It must be conceded that the resolution called for subscriptions payable in cash, and cash only.   It was so held by this court upon a similar question in the case of *New York, Housatonic & Northern R. R. Co.* v. *Hunt;* 39 Conn., 75.   The court say:—"That proviso contemplated subscriptions payable in money, by installments to be regularly called in by the directors.   The defendant had a right to expect and require that subscriptions like his own to the amount of $500,000 should be made, before he should be liable for further installments after the first."   The question then is, was the subscription of Myers & Co. of more than one-half of the capital stock of the plaintiff corporation, a cash subscription?   This seems a strange inquiry in view of the facts of the case.   It was not understood by either of the parties to be payable in cash ; but, on the contrary, it was expressly agreed that fifty per cent. of the subscription should be paid to Myers & Co. for work and materials to be furnished by them in constructing the road.   Previous to this time Myers & Co. had entered into a parol contract with the plaintiffs, wherein it

was agreed that they should have the contract to construct the road and furnish all the materials for it, and that they should subscribe for six thousand shares of the capital stock and take one-half thereof in part payment for their claim; and the parties met at this time to consummate the agreement. Myers & Co. subscribed for the six thousand shares of stock, and they and the plaintiffs executed the contract for constructing the road. These transactions were embraced in the agreement and they constitute substantially one transaction, made so by the mutual and concurrent undertakings of the parties. What matters it then that the subscription of Myers & Co. preceded the execution of their contract for doing the work, when it appears that they subscribed for the stock pursuant to their agreement to do so, relying upon the promise of the company to fulfill their part of the parol contract. *A* deeds his farm to *C* pursuant to a parol agreement for an exchange of farms. Does it make any difference that *A's* deed is executed first in the order of time? Both transactions could not well take place at the same time. One would naturally precede the other; and it matters not which occurs first, so long as both are agreed to be done, and each is made the consideration of the other. So here, Myers & Co. desired to secure the contract for constructing the road. The company were equally desirous that their stock should be taken. Hence the parol agreement providing for both, and making each transaction when performed the consideration of the other, and rendering it of no importance which first occurred in the order of time. How then can this subscription be called a cash subscription? Could the plaintiffs demand cash? That is the criterion. Could they have demanded cash if they had refused to execute the contract of Myers & Co. for doing the work? It is obvious it could not have been done; for to do so would have been perpetrating a fraud on Myers & Co., who had subscribed for the stock in reliance on the promise of the plaintiffs to execute the contract. This is too plain for controversy.

But it is said that the parol agreement should be laid out of the case, on the ground that when parties commit a contract to writing all previous negotiations and parol agreements on

the same subject are presumed to be merged in the written contract. But the difficulty is, the parties in this case never committed or attempted to commit their parol agreement to writing. What was done by them was done simply in performance of their parol agreement. In that agreement Myers & Co. promised to subscribe for the stock, and they did it according to the promise. In the same agreement the company promised to execute a contract to Myers & Co. by which they should do the work and furnish the materials, and they did it in accordance with their promise. It is true that in their subscription Myers & Co. did not state that the stock subscribed for would be paid in work and materials; and a third party ignorant of the parol agreement between the parties, and ignorant of the contract in relation to doing the work, might infer that the stock would be paid for in cash. But the parties to the transaction understood how it was to be paid, and they were bound to the mode of payment as much as they would be if the subscription had stated it. And the contract in relation to doing the work and furnishing materials refers to the subscription, and states how it would be paid. The whole contract does therefore appear in writing, and leaves no room for the claim that there is conflict between the parol agreement and what was afterwards done by the parties in fulfillment of it. It matters not in which document the fact appears, whether it appears in the subscription, or in a separate instrument referring to it and made a part of it.

But it may be said that, inasmuch as the subscription itself does not state the fact, other subscribers of stock might be misled by it, and be induced to pay installments wrongfully. Such was the case with the defendant in one instance; and it would be only repeating the wrong, it seems to me, if we should declare this subscription payable in cash contrary to the agreement. But if this subscription was a fraud on the other subscribers, inasmuch as the plaintiffs were parties to the fraud, the defendant has the right to declare it void to the extent of his interest; and in that case the condition of his subscription has not been fulfilled. The plaintiffs, being parties to the subscription, must take it in the one form or in

.the other. If it was a fraud, then it was void so far as the defendant is concerned. If it was otherwise, then they must take it, as it was in fact, as a subscription payable in part by work and materials; and in either form, the condition of the defendant's subscription has not been fulfilled. It is no answer to say that the defendant's subscription was made while the company was in the hands of the corporators. The company came into existence by the act of incorporation. The act declared the corporators to be a body politic and corporate. This gave it life, and it has been in existence ever since. When the company was afterwards organized, its management passed from the original corporators into the hands of the directors, and that was all. The corporation itself continued the same.

In the case I have cited one Miller made a contract with the railroad company to construct their road and receive part payment for the same to the amount of $300,000 in stock. It was contended that this agreement made him virtually a subscriber to that amount. The claim was made, for the same purpose as here, that the condition of the defendant's subscription had been fulfilled, and that it was therefore a valid subscription. But the court held that Miller was not a stock subscriber within the meaning of the proviso. It is difficult to see any substantial difference between the two cases. Miller agreed to do work and receive $300,000 of stock in part payment for the same. Myers & Co. subscribed for $300,000 of stock, and agreed to construct the road and furnish materials, and receive part payment for the same in the stock subscribed. The stock was agreed to be transferred to them in part payment as the work should progress. They were nominally subscribers to the stock; and this seems to be all the difference in the two cases.

It is said in the case of Miller, that he was in no sense a stockholder until the stock was earned and received in payment for work performed. The same is true here. Myers & Co. had no claim to the stock any farther than as it was earned and received in payment for work done; and even then, the company had the right to retain fifteen per cent. of

what was earned, as a forfeiture in case of a failure to perform, the contract.

It is further said that, inasmuch as the subscription of Myers & Co. appears to be a cash subscription upon the books of the company, like that of all the other subscribers, they would be liable to pay cash for the same in case they failed on their part to perform the contract; and in this respect, that the case differs from the case of Miller. But is this true? They subscribed for stock only in connection with their contract for doing the work. The subscription forms a part of that contract. It is so connected with it that it cannot be separated. How could the plaintiffs demand cash for the subscription, when they not only knew that it was not to be paid wholly in cash, but were themselves parties to the contract agreeing that half of the subscription should be paid in work and materials? It seems to me it would be a novelty in judicial proceedings if such a claim should be sustained. If the stock had been transferred to them on the books of the company, so that it became their property, then the claim might be valid. For then the company might say to Myers & Co., if you do not pay for the stock in work and materials as agreed, you must pay for it in money; you cannot hold the stock and not pay for it. But the stock was never transferred to Myers & Co. Neither was it agreed to be transferred, otherwise than as payment for work and materials, as in the case of Miller. I am unable to discern any difference in principle in the two cases.

See also *Troy & Greenfield R. R. Co.* v. *Newton*, 8 Gray, 596; *Cabot & West Springfield Bridge* v. *Chapin*, 6 Cush., 50.

But it is said that the defendant cannot make the claim that the subscription of Myers & Co. was not payable in cash. It is certainly remarkable if this be true. He made a contract with the corporators, then constituting the plaintiff corporation, to become bound to the extent of ten shares of stock, when the company should procure cash subscriptions to their capital stock amounting to the sum of $534,973. Till such time shall arrive he will be a mere subscriber for stock, and liable only to be assessed to the extent of two per cent. of

the amount of his subscription. That amount of cash sub-scriptions was a prerequisite to any further assessment or liability whatever on the part of the defendant; and the burden is on the plaintiffs to show affirmatively that the condition has been complied with. The company held out the condition as an inducement to the defendant and others to subscribe for the stock; and after subscriptions have been made upon the faith of it, it is strange indeed if the defendant cannot say to the plaintiffs, when they seek to subject him to the extent of his subscription—You have not fulfilled the condition precedent to such a right; the subscription of Myers & Co. was not a cash subscription as the condition requires. There certainly can be nothing in this claim.

The claim of waiver on the part of the defendant is so manifestly unfounded that it needs no consideration, and I pass it without comment.

In conclusion, it appears to me clear that, inasmuch as the subscription of Myers & Co. was not understood by the parties to the transaction to be payable in cash, but on the contrary it was expressly agreed that half of it should be received in payment for work and materials, or, what is the same thing, should be paid for in work and materials, it cannot be made a cash subscription except by an estoppel. But who can claim an estoppel? Who can set up that Myers & Co. cannot claim their subscription to be any thing else than what it appears to be on the face of the subscription? Can these plaintiffs do it, who knew all the facts in relation to it and were parties to the transaction? Manifestly not. Perhaps a stock subscriber might do it to the extent of his injury, who had been lured into payment of installments in consequence of their subscription and had brought suit against them for damages, if he could gain any thing by so doing. But his case would depend upon showing that the subscription was not in fact what it purported to be; and hence an estoppel would defeat his claim.

Perhaps a creditor of the company might do it in some circumstances to the extent of his claim, but we have no such case here. I see no other way by which the subscription in

question can be made a cash subscription by an estoppel. The contract made by the defendant with the company was that he would become a stockholder and assume all the liabilities incident to that relation, when cash subscriptions to a certain amount should be taken. That time has not yet arrived. All the other subscribers are in the same condition. The company is yet in embryo, and has, in my judgment, no right to the installment sought to be recovered in this suit.

I think a new trial should not be advised.

In this opinion Loomis, J., concurred.